UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| MYLOTTE, DAVID & FITZPATRICK, | : | |
| Debtor | : | Bankruptcy No. 07-14109bf |
| _____ | | |
| THE CITY OF PHILADELPHIA, | : | |
| Plaintiff | : | |
| v. | : | |
| MYLOTTE, DAVID & FITZPATRICK A PARTNERSHIP, et al., | : | |
| | : | |
| Defendants | | Adversary No. 07-0419 |
| | : | |
| WILMINGTON TRUST OF PENNSYLVANIA, | : | |
| Garnishee | | |
| _____ | | |

...............................................

MEMORANDUM

...............................................

Presently before me is the motion of garnishee Wilmington Trust of

Pennsylvania ("WTPA") for summary judgment.[1]  This motion is opposed by the plaintiff

_____

[1]As will be mentioned below, this proceeding was removed from state court.  The notice of removal filed by the City of Philadelphia identifies the defendants as Mylotte, David & Fitzpatrick and First Wilmington Trust Bank.  I note, however, that the state court caption in the removed civil action identified the defendants as Mylotte, David & Fitzpatrick, A Partnership plus its three general partners.  In responding to summary judgment, the plaintiff altered the caption so that the defendants are purported to be "Mylotte, David & Fitzpatrick and Wilmington Trust Bank."  Wilmington Trust of Pennsylvania, the entity named in the state court interrogatories in attachment (also to be discussed below), filed the present motion for summary judgment.  The movant files its pleadings in this court with "Mylotte, David & Fitzpatrick, et al." as the defendants.  A March 16, 2007 order issued by the state court and resolving a dispute between the City and WTPA captioned the defendants as WTPA has done in its summary judgment motion and added "Wilmington Trust of Pennsylvania, Garnishee" to the caption.  I

(continued...)

City of Philadelphia ("City"), which argues that material facts are in dispute.

This adversary proceeding began as a civil action brought by the City for unpaid taxes against the law firm of Mylotte, David & Fitzpatrick and its three general partners in the Philadelphia Court of Common Pleas, docketed at February Term 2005, No. 1479. On October 11, 2007, an order for relief was entered in this court on an involuntary bankruptcy petition filed against the partnership Mylotte, David & Fitzpatrick. On December 18, 2007, the City removed the entire state court civil action to this court pursuant to 28 U.S.C. § 1452, whereupon it was docketed as an adversary proceeding.[2]

No party to that state court civil action has sought to remand this proceeding to state court. The City has asserted under Fed. R. Bankr. P. 9027(a)(1) that this proceeding is a core matter. See Notice of Removal, ¶ 20. In response to the notice of removal, WTPA has pled under Rule 9027(e)(3) that the proceeding is non-core but

_____

[1](...continued)
have used the state court caption in its March 16th order as the most accurate.

[2]The state court civil action involved a judgment against the defendants and numerous execution efforts directed against third parties, including but not limited to WTPA. The City elected to have removed the entire civil action, as the notice of removal does not state otherwise: "The City . . . hereby removes the action docketed at February Tem, 2005, No. 1479, in Philadelphia County Common Pleas Court . . . ." See 28 U.S.C. § 1452(a); In re Princess Louise Corp., 77 B.R. 766, 771 (Bankr. C.D. Cal. 1987) ("[T]he scope of what is removed from the state court to the bankruptcy court is determined by the removal petition."); see also Berry v. Pharmacia Corp., 316 B.R. 883, 887 (S.D. Miss. 2004).

Although the bankruptcy stay may still apply to other aspects of this removed litigation, see generally Fed. R. Bankr. P. 9027 Advisory Committee Note (1983) ("If the claim or cause of action which is removed to the bankruptcy court is subject to the automatic stay of § 362 of the Code, the litigation may not proceed in the bankruptcy court until relief from the stay is granted."), the parties assume and I agree that the bankruptcy stay does not preclude prosecution of the City's claim, if any, against garnishee WTPA, which claim would be recoverable from assets of WTPA. See generally, e.g., McCartney v. Integra Nat. Bank North, 106 F.3d 506, 509-10 (3d Cir. 1997) (bankruptcy stay does not protect non-debtors).

2

nonetheless consents to the entry of a final order.  Statement of Garnishee WTPA, ¶ 20.

Therefore, these two parties agree that I can enter a final order in connection with the

instant summary judgment motion.  See, e.g., In re Pennsylvania Gear Corp., 2008 WL

2370169, at *5 (Bankr. E.D. Pa. 2008).  And as the outcome of this adversary proceeding

could conceivably reduce the City's claim against the debtor, I concur that subject

matter jurisdiction exists.  See generally In re Canion, 196 F.3d 579, 586-87(5th Cir.

1999); In re Dogpatch U.S.A., Inc., 810 F.2d 782, 786 (8th Cir. 1987).

I.

Upon review of the parties' submissions, I find the following facts are not

in dispute.[3]

A.

I shall begin with the procedural history.

As noted above, the City brought suit against Mylotte and its three general

partners for unpaid taxes in February 2005.  On May 3, 2006, the City, Mylotte and the

partners stipulated to the entry of judgment against the defendants in the amount of

$1,700,000.  City Response to Summary Judgment ex. G; Motion and Response, ex. A

(docket entry 5/3/06).  Thereafter, the City sought to execute upon its judgment by

---

[3]Neither party desired oral argument.

3

serving writs of execution against numerous banks, including WTPA.  See Motion, ex. A

(docket entries 7/12/06; 8/9/06); see generally Pa. R. Civ. P. 3102.

Consistent with state procedure, on July 13, 2006, along with a writ of

execution, the City served WTPA with interrogatories in attachment.  Surreply, ex. A;

Response, ex. J; see generally Pa. R. Civ. P. 3144.  Pursuant to Pennsylvania Rule of

Civil Procedure 3145, service of these interrogatories was akin to commencing a

complaint by the City against WTPA.  WTPA then filed an answer to the interrogatories.

Response ex. K; see Pa. R. Civ. P. 3145.  This answer acknowledged that the garnishee

held certain Mylotte funds on deposit.  WTPA then filed a revised answer identifying

additional Mylotte funds on deposit.  Response, ex. L.

On July 28, 2006, the City obtained a judgment against WTPA as garnishee,

under Pa. R. Civ. P. 3146, in the amount of $69,839.40, based upon funds of Mylotte on

general deposit with that bank.  See Response, ex. A (docket entry).  On September 6,

2006, WTPA moved to strike the City's judgment against it.  Id.

On October 18, 2006, the state court granted this motion and entered an

order striking off the City's judgment against WTPA.  See Motion, ex. E.  In a footnote,

the court explained its ruling as follows:

> The City of Philadelphia [Plaintiff] instituted this suit against
> Mylotte David & Fitzpatrick, et al [Defendants] for unpaid
> taxes.  Plaintiff served interrogatories on Wilmington Trust
> [WT] as garnishee pursuant to Pa.R.C.P. 3144.  WT indicated
> in its responses that Defendants maintained four (4) accounts
> with WT - balance of $115,000.  Plaintiff caused the
> Prothonotary to enter judgment by admission against WT in
> the amount of $69,839.40 pursuant to Pa.R.C.P. 3146(b).  WT
> avers that those accounts were subject to an automatic lien in
> favor of WT as a result of demand notes issued by WT to
> Defendants.  WT avers that at the time the judgment by
> admission was entered, the demand note was approximately

4

$250,000.  WT contends that it is entitled to a common law right of set-off.

Aarons v. Public Service Building & Loan Association, 178 A. 141 (Pa. 1935), established the right of set-off as part of the Common Law in Pennsylvania.  In Royal Bank of Pennsylvania v. Selig, 644 A.2d 741, 744 (Pa. Super. 1994) (citations omitted), the court held that when the depositor's debt matured, the bank's right to set-off by operation of law extinguished the depositor's right to the account.  The bank's right to set-off takes priority over other creditors claiming a right to the funds, notwithstanding the filing or service of attachment execution or garnishment.  In the instant case, the Defendants' [depositors'] debt to the bank matured prior to the creditor's attachment.  Therefore, WT could set-off the checking account balance against the money owed despite the intervening attachment.  Nat'l Bank & Trust co. v. CCNB Bank, 667 A.2d 1151, 1153 (Pa. Super. 1995).  Since the funds in the Defendants' account were subject to the automatic lien of WT, the funds no longer belonged to Defendants.  Therefore, Plaintiff had no right to cause the Prothonotary to enter a judgment by admission against WT. In Ruehl v. Maxwell Steel Co., 474 A.2d 1162, 1164 (Pa. Super. 1984), the court held that "[w]here judgment against a garnishee is improperly entered on the basis of admissions in the garnishee's answers to interrogatories, the judgment may be stricken."  Therefore, since the judgment was improperly entered against the garnishee, the petition to strike off the judgment by admission is granted.

Id.  The City did not appeal from this order.  The state court did not enter any order, however, terminating the writ of execution.[4]  Nor did the City seek contempt against WTPA for any actions taken as garnishee.

_____

[4]The state court also issued an order on March 16, 2007, awarding WTPA $28,064.86 in attorney's fees and $876.60 in court costs against the City, based upon 42 Pa. C.S. § 2503(3).  Motion, ex. F.  In making this award, the state court construed its earlier October 18th order as holding that no property of defendant Mylotte was in the possession or control of WTPA.  Id.  The City's appeal from this award was discontinued on September 11, 2007. Motion, ex. G.

On October 11, 2007, after trial in this bankruptcy court, an order for relief was entered against Mylotte upholding an involuntary chapter 7 bankruptcy petition filed against it.  On November 5, 2007,  Mylotte's motion to convert this bankruptcy case to one under chapter 11 was granted.  WTPA then filed a secured proof of claim dated March 5, 2008 in the amount of $685,405.50.  Response, ex. R.[5]  The City filed a priority proof of claim on April 17, 2008, dated April 7, 2008, in the amount of $233,935.25.[6]

B.

A contractual relationship existed between Mylotte and WTPA at the time of the City's garnishment action based upon a business loan agreement dated June 6, 2000.  Response, ex. S.[7]  By virtue of this agreement, WTPA promised to advance funds to Mylotte in the future if Mylotte met certain conditions, and such loans would be secured by specified collateral.  Id.  According to the state court decision, at the time the City served its writ of execution upon WTPA in July 2006, four separate Mylotte bank accounts with WTPA existed, totaling $115,000, and an outstanding obligation of about $250,000 was owed to WTPA.  Motion, ex. E.

---

[5]Mylotte had 3 loans outstanding with WTPA as of June 14, 2007, with a total principal balance of about $635,000.  Motion, ex. C.

[6]The City also filed two other proofs of claim, one dated January 14, 2008, and the other dated April 7, 2008.  Neither of the two claims dated April 7, 2008 are denoted as amended claims, although they may be.

[7]This document attached to the City's summary judgment response is extremely difficult to read without magnification aides.  Furthermore, the document is incomplete.

6

The four accounts identified by WTPA in its revised answers to the City's interrogatories in attachment were as follows:

| | | |
|---|---|---|
| #400-2767-6596 | $57,162.10 | |
| #400-1334-0102 | $5,178.32 | |
| #400-1334-0293 | $7,498.98 | Escrow account |
| #400-2767-6367 | $45,417.14 | IOLTA account |

Response, ex. L.

The June 2000 business loan agreement contained a right of setoff in favor of WTPA.  Response, ex. S at WT00086.  It also defined a default by Mylotte to include the entry of judgment against it in an amount exceeding $10,000, which judgment was neither satisfied within 30 days nor covered by insurance, and by institution of a garnishment action.  Id.  In the event of a default, any obligation on behalf of WTPA to make a loan advance was terminated:

> If any event of default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all indebtedness immediately will become due and payable. . . .  Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be [illegible] singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not effect Lender's right to declare a default and to exercise its rights and remedies.

Id.

In its response to summary judgment, the City proposes to offer evidence at trial that WTPA did not immediately freeze the two general Mylotte accounts.  As a result, Mylotte transferred $50,000 from a WTPA account on July 14, 2006.  Response,

7

ex. P.  This transfer was recovered by WTPA prior to July 30, 2006 and restored to the

bank account from which it had been transferred.  See id.; WTPA Reply, ex. B.[8]

      The City also intends to offer evidence at trial that on May 3, 2006, Mylotte

opened a bank deposit account with Wilmington Trust Company of Delaware ("WTC").

Response, exs. H and I.  WTPA acknowledges that fact.  Statement of Garnishee, ¶ 9.

This account was opened because Mylotte anticipated that the City would execute against

its Pennsylvania accounts after entry of the May 3, 2006 stipulated judgment.  Response,

ex. I.[9]  The City has attached records from the WTC account in its opposition to summary

judgment that reflect extensive use of this account by Mylotte from May 2006 until April

2007.  Response, ex. Q.  Based upon these records, the City asserts that it can prove at

trial that Mylotte deposited more than $1.3 million into this WTC Delaware bank account

and used these funds to operate its business.  Id.

      Furthermore, the City refers to a provision of the 2000 business loan

agreement that identified a "Deposit Requirement: Primary Bank Account" as part of the

---

[8]The City argues that "WTPA never terminated the Pennsylvania account" and
that its bank records, Response, ex. T, "show account activity up to April 30 of 2007. . . ."
Response, ¶ 34.

   My review of these records, Response, ex. T, reveals that there was no activity in
account # 400-2767-6596 after July 31, 2006, with this account closed on or before September
29, 2006.  Money market advantage account # 400-1334-0102 shows no activity except for the
accruing of interest from June 30, 2006 until March 22, 2007, when the account was closed.  And
money market advantage account # 400-1334-0293 also had no activity from June 30, 2006 to
April 30, 2008.

     The only activity in any Mylotte account was in its checking account # 400-2767-
6367.  This account showed a few deposits and withdrawals between August 2006 and April 30,
2007, with an April 30, 2007 ending balance of $45,476.48.  This account, however, was
Mylotte's IOLTA account and, as will be discussed, was not subject to attachment by the City.

     [9]The City acknowledges that bank accounts in Delaware are not subject to
garnishment.  City Response, at 8, ¶ 10, citing 10 Del. Code § 3502(b).

loan collateral.  Response, ex. S at WT00083.  Based upon this collateral identification,
the City asserts that Mylotte had agreed to use only the WTPA account for its business
operations and that it can prove at trial that WTPA knew or should have known of the
existence of the Delaware bank account extensively used by Mylotte in lieu of the
garnished WTPA bank accounts.  See Response, ex. U.

    The City also intends to demonstrate at trial that in February 2007, WTPA
extended a $75,000 line of credit to Mylotte, which credit facility was used.  Response,
ex. V.  Again, WTPA acknowledges this fact.  Statement of Garnishee, ¶ 16.  This loan
was part of a "workout" arrangement between Mylotte and WTPA, by which WTPA
anticipated that Mylotte would use this loan advance to operate and collect outstanding
receivables.  WTPA Reply, ex. C.  The City contends that it can demonstrate that these
loan proceeds were deposited into Mylotte's WTC Delaware account.  Response, ex. W
(bank statement showing a credit of $75,000 on February 1, 2007).

    Finally, the City intends to prove at trial that WTPA is a "Pennsylvania
chartered bank and trust company owned by the Wilmington Trust Corp., a Delaware
corporation and holding company."  Response, at 7 ¶ 1.  Wilmington Trust Corp. also
owns the Wilmington Trust Company, a Delaware-chartered bank and trust company.  Id.
These two affiliate banks shared certain services: "support services, documentation,
deposit services, credit review, human resources, and marketing."  Response, ex. E at 30.

II.

As noted above, this proceeding was removed from state court.  Both

WTPA and the City agree that, under Fed. R. Bankr. P. 9027(g), federal procedural rules

now govern this dispute.  Thus, the instant motion for summary judgment is governed by

federal bankruptcy procedure.  See, e.g., In re Enron Corp., 292 B.R. 752, 761 (Bankr.

S.D.N.Y. 2003); In re Shenango Group, Inc., 186 B.R. 623 (Bankr. W.D. Pa. 1995), aff'd,

Belcufine v. Aloe, 112 F.3d 633 (3d Cir. 1997).

Federal Rule of Bankruptcy Procedure 7056 incorporates Fed. R. Civ. P.

56, the summary judgment rule, into bankruptcy adversary proceedings.  The purpose of

summary judgment is to avoid the expense and delay of an unnecessary trial when no

material facts are in dispute and one or more of the parties is entitled to prevail on the

merits.  See, e.g., Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976),

cert. denied, 429 U.S. 1038 (1977).  The standard for determining the applicability of

summary judgment under Rule 56 is well established.  As the Third Circuit Court of

Appeals observed:

> Summary judgment is appropriate when the moving party is
> entitled to judgment as a matter of law and there is no genuine
> dispute of material fact. . . .  In order to defeat "a properly
> supported summary judgment motion, the party opposing it
> must present sufficient evidence for a reasonable jury to find
> in its favor."  Groman v. Township of Manalapan, 47 F.3d
> 628, 633 (3d Cir. 1995) (citing Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 250-52, 106 S. Ct. 2505, 2511-12, 91 L.
> Ed. 2d 202 (1986)).  In essence, the non-moving party must
> demonstrate a dispute over facts that might affect the outcome
> of the suit.  Id.  Moreover, in reviewing the record, we must
> give the non-moving party the benefit of all reasonable
> inferences. . . .

10

Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir. 1996).

The application of these general principles is affected by the allocation of the evidentiary burden of persuasion. A trial court's approach to summary judgment is influenced by whether the party seeking summary judgment would have the burden of persuasion at trial. See generally Coquellette, et al. 11 Moore's Federal Practice 3d, §§ 56.03[4], 56.13[3] (2006). This approach was well summarized in Adams v. Consolidated Rail Corp., 1994 WL 383633, at *1-*2 (E.D. Pa. 1994):

> The Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment in Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court held that where the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but that this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. Id. at 323. In contrast, where, as here, "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). To sustain its initial burden under such circumstances, the movant must:
>
> > "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."
>
> Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). . . . If the movant makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact[.]

(citations omitted); see Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir 1989); In re White, 243 B.R. 498, 501 n.4 (Bankr. N.D. Ala. 1999).

Thus, "[w]hen, as here, the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.  The nonmoving party creates a genuine issue of material fact if he provides sufficient evidence to allow a reasonable jury to find for him at trial."  Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998).

As noted earlier, in applying the above-mentioned standard for summary judgment, "[the court must] view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); see also Wetzel v. Tucker, 139 F.3d at 383 n.2; Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir.), cert. denied sub nom. Pennsylvania Secretary of Public Welfare v. Idell S., 516 U.S. 813 (1995); Valhal Corp. v. Sullivan Associates, Inc., 44 F.3d 195, 200 (3d Cir. 1995); Goodman v. Mead Johnson & Co., 534 F.2d at 573.  Moreover, the moving party bears the burden of proving that no genuine issue of material fact is in dispute.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  Once the movant has carried its initial burden, however, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)).  As explained by the Third Circuit:

> At the summary judgment stage of proceedings, if the movant
> —in this case the Defendants—can point to the absence of
> any factual support for one of [the] essential elements [of the
> complaint], then the non-movant, bearing the burden of

12

persuasion at trial, must introduce specific facts showing a
need for trial, pursuant to Fed. R. Civ. P. 56(e).  See Celotex,
477 U.S. at 322-24, 106 S. Ct. 2548.  If the non-moving party
fails to go beyond conclusory allegations in its pleadings and
to produce specific facts indicating that there is a genuine
issue for trial, summary judgment will be granted in favor of
the moving party.

Annulli v. Panikkar, 200 F.3d 189, 198-99 (3d Cir. 1999) (overruled on other grounds by

Rotella v. Wood, 528 U.S. 549 (2000)) (citations omitted).

WTPA is the party moving for summary judgment; therefore, as the non-

moving party, the City must receive the benefit of all reasonable inferences drawn from

the underlying facts.  The City, however, recognizes that it is the party with the burden of

persuasion on the merits in this proceeding and so must demonstrate that there are

material facts which warrant a trial.  Response, at 3-4.

III.


A.


The civil action removed to this court from state court and now pending as

this adversary proceeding is the City's lawsuit against Mylotte.  One component of that

civil action is the City's garnishment efforts directed at WTPA.  As the Pennsylvania

Supreme Court has explained, when the City served a writ of attachment and

interrogatories in aid of garnishment, a limited cause of action was commenced:

Plaintiff's action, as related to the bank, was begun by the
writ of attachment execution.  'As to the defendant in the
judgment on which it issues, it is a species of execution
process; but as to the garnishee, who becomes a party

13

> defendant therein, it is an original process,–a summons
> commanding him to appear and show cause, if any he has,
> why the judgment in favor of the plaintiff should not be levied
> of the goods and effects of the defendant in his hands.  In
> form as well as in effect the summons clause of an attachment
> execution, required to be served on the garnishee, is in every
> proper sense of the term a 'writ.' * * *'  Kennedy v. Insurance
> Co., 165 Pa. 179, 183, 30 A. 724, 725.

Aarons v. Public Service Building & Loan Ass'n, 318 Pa. 113, 118 (Pa. 1935).

Thus, garnishment is an execution remedy that permits judgment creditors to reach the assets of judgment defendants when those assets are in the possession of a third party.  See, e.g., Brown v. Candelora, 708 A.2d 104, 107 (Pa. Super. 1998). Garnishment proceedings determine only whether a garnishee "owes a debt to the judgment debtor, or has property of the judgment debtor."  Garden State Standardbred Sales Co., Inc. v. Seese, 417 Pa. Super. 15, 18 (1992).  A valid claim is made against a garnishee only if the garnishee has possession, control or custody of property of the debtor.  See Pa. R.C.P. 3101(b)(2).  A judgment plaintiff cannot attach property belonging to a non-judgment defendant, nor does the garnishor obtain rights against property, or against the garnishee, that are greater than those of the judgment defendant. See Austin-Nichols & Co. v. Union Trust of Pittsburgh, 289 Pa. 341, 346 (1927).

The garnishment process commences when the judgment creditor files a praecipe for writ of execution with the prothonotary of the county in which the judgment has been entered.  Pa. R. Civ. P. 3103(a).  The county sheriff serves this writ upon the garnishee.  Pa. R. Civ. P. 3111(a).  Service of the writ attaches all property of the judgment defendant that is in the possession of the garnishee and that is otherwise attachable under Pennsylvania law.  Pa. R. Civ. P. 3111(b).  Attachable property of the

14

judgment defendant that comes into possession of the garnishee after service of the writ is also attached.  Id.

Proper service of the writ of execution upon the garnishee effects "an equitable assignment" of the judgment defendant's property held by the garnishee for the benefit of the judgment creditor.  Aarons v. Public Service Building & Loan Ass'n, 318 Pa. at 117; see also Royal Bank of Pennsylvania v. Selig, 434 Pa. Super. 537, 544 (1994). The garnishee is enjoined from paying any debt to or for the account of the judgment defendant and from delivering any attached property of the judgment defendant until such time as the judgment against the garnishee is satisfied or the writ is discontinued or terminated.  Pa. R. Civ. P. 3111(c).

Pursuant to Pa. R.C.P. 3011(d), "[v]iolation of the mandate and injunctive orders of the writ may be punished as contempt."  See also Goodstein v. Goodstein, 1991 WL 352658, at *6 (Pa. Com. Pl. 1991).  Civil contempt proceedings are remedial in nature; they are intended to coerce a defendant into compliance with a court's order, and, if necessary, to compensate the complaining party for any loss sustained.  See C.R. by Dunn v. Travelers, 626 A.2d 588, 592 (Pa. Super. 1993).  The complainant must prove that the defendant violated the order by a preponderance of the evidence.  Sinaiko v. Sinaiko, 664 A.2d 1005, 1009 (Pa. Super. 1995).  Furthermore, the court's exercise of contempt power against a garnishee under Rule 3111(d) is discretionary.  See, e.g., Royal Bank of Pennsylvania v. Selig, 434 Pa. Super. at 551.

Service of the writ of execution does not, by itself, recover for the judgment plaintiff any property of the judgment defendant held by the garnishee.  In order to obtain such property, the judgment plaintiff serves interrogatories upon the garnishee requesting

15

information about property of the judgment defendant in the possession of the garnishee.

Pa. R. Civ. P. 3144.  Service of these interrogatories is the equivalent of serving a

complaint, and the garnishee must then file a timely response or suffer default.  Pa. R.

Civ. P. 3145, 3146.  The garnishee is permitted to raise any defense or counterclaim that

it may have against the judgment defendant.  Pa. R. Civ. P. 3145(b)(2); see, e.g., Aarons

v. Public Service Building & Loan Ass'n, 318 Pa. at 117:

> [The garnishee] may make the same defense to the attachment
> by evidence of set-off or of other equities that he might have
> made if sued by his original creditor.

If the garnishee responds to interrogatories admitting to possessing property of the

judgment defendant that is attachable under state law then:

> [T]he court shall determine and enter judgment for the value
> of the property of the defendant in the hands of the garnishee
> but shall not enter judgment in excess of the judgment of the
> plaintiff against the defendant together with interest and costs.
> If the garnishee fails to appear, or if appearing offers no
> evidence, the amount of the judgment shall thereupon be
> entered in the amount of the plaintiff's judgment against the
> defendant together with interest and costs, and the court may
> also award to the plaintiff reasonable expenses including
> attorney's fees.

Pa. R. Civ. P. 3146(a)(1).

Rule 3147 provides that a judgment can be entered against the garnishee,

and this judgment can take the form of a traditional money judgment or judgment for

specific property.  See Pa. R. Civ. P. 3148.

B.

In its notice of removal, the City asserted:

16

> "The Bank, and/or the Debtor, also interfered with, and
> prevented, the City garnishment of, inter alia, garnishee
> Mercy Health Systems, Inc., and Temple University Health
> Systems, without explanation of its basis for doing so.

Notice of Removal, ¶ 17.  The City's opposition to summary judgment does not refer to

any evidence it intended to introduce at trial that would prove that WTPA interfered with

garnishment efforts against these two health systems.  Nonetheless, the City maintains

that it will prove at trial, based upon the evidence summarized above, that "WPTA

interfered" with its garnishment efforts and that such alleged interference gives rise to a

state law cause of action.  Response, at 2, 3-4.

      I find the City's description of its claim against the garnishee to be inexact.

In this adversary proceeding, there are only two potential forms of relief available to the

City against WTPA, given the City's service of a writ of execution as well as

interrogatories in garnishment.

      First, the City could obtain a judgment against WTPA, as garnishee, for the

value of property held by WTPA that belonged to Mylotte.  Second, WTPA could be held

in civil contempt if it violated the injunction created by the execution attachment.  If the

City possesses any other claims against WTPA, those claims are not presently before me.

See Garden State Standardbred Sales Co, Inc., 417 Pa. Super. at 21 ("Given this

reasoning and the supreme court's holding in Greater Valley, which was evidently

designed to afford defendants clear procedural safeguards in claims in which fraudulent

conveyance is alleged, we must conclude that the trial court was correct in ruling that the

use of the garnishment proceeding was improper."); Kaye v. Mutschler, 1999 WL

529660, at *3 n.1 (Pa. Com. Pl. 1999).

As to the first cause of action—judgment for the value of Mylotte's property held by the garnishee—the state court has already adjudicated that issue.  In its October 2006 order, it held that WTPA held an affirmative defense of setoff against Mylotte that superceded the City's execution levy.  Such a ruling constitutes a valid order in this removed adversary proceeding.  See generally In re Farah, 126 Fed. Appx. 66, 70-71 (3d Cir. 2005) (non-precedential); In re Diet Drugs, 282 F.3d 220, 232 n.7 (3d Cir. 2002); In re BriarPatch Film Corp., 281 B.R. 820, 829-31 (Bankr. S.D.N.Y. 2002).  In the City's submissions opposing summary judgment, it does not request that I vacate that determination.  Moreover, to the extent that I have the power to do so, see generally Resolution Trust Corp. v. Nernberg, 3 F.3d 62, 68-69 (3d Cir. 1993); Eckell v. Borbidge, 114 B.R. 63, 68 n.5 (E.D. Pa.,1990), I would decline.  See also Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice.") (quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)).  The state court's determination of WTPA's right of setoff was consistent with Pennsylvania law.

Pennsylvania recognizes a common law right of setoff.  Royal Bank of Pennsylvania v. Selig, 434 Pa. Super. at 544-45 ("A creditor's right to attach a general bank account of its debtor is subject to the garnishee-bank's right to setoff any matured obligation owed to it by its depositor."); see Pioneer Commer. Funding Corp. v. Am. Fin. Mortg. Corp., 579 Pa. 275, 284 n.11 (2004); Aarons v. Public Service Building & Loan Ass'n, 318 Pa. at 118-19.  It is "generally established that a bank has a general lien upon,

or right of setoff against, all moneys or funds in its possession belonging to a depositor to secure the payment of the depositor's indebtedness to it."  13 Standard Pennsylvania Practice § 77:29 (2d ed. 2004).  In order for setoff rights to arise, there must be (1) mutuality of obligation between the depositor and the bank, (2) the funds to be setoff must belong to the depositor, (3) the funds must be deposited in a general, as opposed to special purpose, account, and (4) the debt owed to the bank by the depositor must be matured.  Royal Bank of Pennsylvania v. Selig, 434 Pa. Super. at 545.

Once the depositor's obligation owed to the bank matures, the bank's setoff rights extinguish the depositor's interest in the bank account.  Id.  The extinguishment of the depositor's interest occurs by operation of law.  Id.  Moreover, filing and serving a writ of execution after setoff rights have arisen will not disturb or displace those setoff rights.  Id.  "In effect, the garnishee-bank's common law right to setoff gives it a right to self-help that takes priority over other creditors claiming a right to the funds on deposit."  Id.  Furthermore, a bank's right of setoff need not be exercised prior to service of a judgment plaintiff's writ of execution in order to serve as a valid defense to any garnishment proceeding.  See Adolph Bergman Building & Loan Ass'n v. Blaul, 318 Pa. 126 (1935).

Here, WTPA held demand notes along with both a contractual as well as common law right of setoff.  Because the garnishee held valid setoff rights under Pennsylvania law prior to service of the writ of execution and interrogatories in garnishment, Mylotte's interest in its bank accounts was subordinate to WTPA's interest; and, therefore, the garnishee's interest was superior to that of the City/garnishor, as the

19

latter was limited to the interest of its judgment defendant.  See Royal Bank of

Pennsylvania v. Selig, 434 Pa. Super. at 551.


C.


While the state court's October 2006 ruling expressly addressed WTPA's

affirmative defense of setoff as to bank accounts in its possession, it implicitly decided

two other issues, one or both of which may now be implicitly challenged by the City.

First, when the City served its interrogatories upon WTPA, the garnishee

held four bank accounts in the name of Mylotte.  Two of those accounts were general

accounts and two were special interest accounts: an escrow account and an IOLTA

account.  Neither of those special interest accounts was subject to WTPA's right of setoff.

See Royal Bank of Pennsylvania v. Selig, 434 Pa. Super. at 546.  Similarly, neither of

these accounts was subject to garnishment by the City.  See, e.g., Austin-Nichols & Co. v.

Union Trust Co. of Pittsburgh, 289 Pa. at 346-47; Guelich Explosive Co. v. Soberdash

Coal Co., 21 Pa. D.&C. 4th 55, 57-58 (C.P. Som. Co. 1992); see also Crystal Cabinet

Works, Inc. v. Rattle Run Development Co., 1997 WL 33354614, at *4 (Mich. App.

1997).

Consistent with this restriction upon attachment, the initial judgment against

WTPA, later stricken, was in an amount limited to the value of the two general bank

accounts, and thus did not include the value of either the escrow or IOLTA accounts.  The

City does not appear to challenge this conclusion.  See Response, ¶¶ 15-16.  Nonetheless,

it now complains that WTPA did not freeze the IOLTA account and thus there was activity in that account after July 2006.  Response, ¶ 34.

Even if the City could prove such activity at trial, it would not yield any entitlement to judgment in this proceeding equal to the value of the funds not frozen.  As the IOLTA account was not attachable, had WTPA elected to freeze it upon service of the execution writ such action by the garnishee would have been dissolved.  See Guelich Explosive Co. v. Soberdash Coal Co., 1992 WL 696595, at *4.

Second, the City opposes summary judgment intending to prove at trial that WTPA and WTC of Delaware are affiliate branch banks of Wilmington Trust Corporation and share a number of banking services.  Such evidence, which does not reflect that WTPA exercises control of accounts at WTC of Delaware, would not be material in this proceeding.

The service of a writ of execution solely upon WTPA did not serve to freeze Mylotte's accounts with WTC of Delaware.  Not only does Delaware state law preclude such a result, see 10 Del. Code § 3502(b); Bank of Delaware v. Wilmington Housing Authority, 352 A.2d 420,  (Del. Super. 1976), but in garnishment proceedings different branches of the same bank typically are treated as separate entities, and by virtue of their independence the accounts maintained in one branch are separate and distinct from accounts held in another branch.  See Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50, 53 (2d Cir. 1965); Sara Lee Corp. v. Gregg, 2003 WL 23120116, at *3 (M.D.N.C. 2003); In re Estate of Marcos Human Rights Litigation, 1997 WL 428544, at *3 (N.D. Ill. 1997); Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp., 921 F. Supp. 1113, 1119 (S.D.N.Y. 1996) ("Fidelity has

21

cited no authority supporting its rather extraordinary proposition that a sheriff or marshal

serving an execution under CPLR § 5232 in New York can levy upon deposits in a bank

account in another jurisdiction."); <u>Doe v. CFS Bank</u>, 2000 WL 1705642 (Conn. Super.

2000).

The concept of bank branches being treated as independent of one another

is known as the "separate entity rule." One court explained the policy rationale for the

rule as follows:

> The separate entity rule is supported by considerations of
> banking efficiency. Transaction costs and potential liability
> are both increased if all branches of a bank are considered a
> single entity for attachment purposes. Specifically, each
> branch would face potential liability every time it released
> funds without verifying that no attachment had been placed
> on those funds at any other branch. Banks' transaction costs
> would increase from the communication necessary to avoid
> such liability. By treating each branch as a separate entity,
> banks may effectuate their daily business, and their
> compliance with attachment orders, more efficiently.

<u>Sara Lee Corp. v. Gregg</u>, 2003 WL 23120116, at *3.

Neither party has referred to a Pennsylvania state court decision explicitly

adopting or rejecting the separate entity rule for judgment execution purposes. Under

Pennsylvania's version of the Uniform Commercial Code, however, different branches of

the same bank are considered separate entities for the purpose of "computing the time

within which and determining the place at or to which action may be taken or notice or

order must be given." 13 Pa. C.S.A. § 4107. Because Pennsylvania law recognizes

branch banks as separate entities for certain purposes, it seems probable that Pennsylvania

would adopt the separate entity rule in garnishment proceedings, at least where, as here,

the other bank is outside of Pennsylvania. Thus, I conclude that WTPA and WTC of

22

Delaware are separate and distinct financial institutions for the purpose of this garnishment proceeding.  Therefore, the writ of execution served on WTPA had no affect on (i.e., did not attach) the funds in the debtor's account held by WTC of Delaware.

Accordingly, the City has not demonstrated in opposing summary judgment that it would present relevant evidence at trial that would entitle it to judgment against the garnishee, WTPA, based upon the value of attachable property of Mylotte that was in the garnishee's possession or control after service of the writ of execution in July 2006.


IV.


The City's second possible cause of action in this adversary proceeding is civil contempt under Rule 3111(d).  Toward such relief, the City argues as follows:

> The City can show that: (1) WTPA failed to freeze the Mylotte account immediately upon service of the City Writ of Execution, and transferred funds between the two accounts; (2) despite the occurrence of a default under the WTPA-Debtor loan agreement, WTPA did not terminate its account with the Debtor; and (3) WTPA directly deposited money into the WTC account, despite knowing, or imputed knowing, of the City garnishment.

Response, at 15.

Furthermore, the City maintains that if civil contempt is proven, the proper sanction is to require WTPA to pay to the City the difference between the funds deposited by Mylotte into the WTC of Delaware bank account (purportedly totaling about $1.35 million over time) and the amount of WTPA's claim (about $685,000).  Response, at 17-18.  The City argues that such a sanction is appropriate because Mylotte should have

deposited all of the WTC funds with WTPA, where they would have been subject to the

City's July 2006 attachment.  Id.

      WTPA contends that it is highly unlikely that Mylotte would have deposited

more than $1.35 million into a bank account that was frozen and from which it could not

make withdrawals.  Movant's Reply, at 8.  However, I need not reach that issue in the

context of this motion.  Instead, I find the City's assertion of civil contempt unpersuasive,

even if its factual assertions are provable, because the City misconstrues the

responsibilities of a garnishee under Pennsylvania law.

      First, the City fairly notes that WTPA did not immediately freeze the

general Mylotte bank accounts.  Prior to freezing these two accounts in late July 2006,

Mylotte had transferred $50,000.  The undisputed evidence also demonstrates that these

funds were credited back into the WTPA accounts within 12 days of service of the writ of

garnishment.  As the funds were restored, and as WTPA held a setoff right that included

the $50,000 transferred, the City was not harmed and it would be an inappropriate

exercise of discretion to hold WTPA in contempt in those circumstances.  See Royal

Bank of Pennsylvania v. Selig, 434 Pa. Super. at 551.[10]

      In addition to WTPA's failure to freeze the debtor's general bank accounts

immediately upon service of the writ of execution, the City makes two additional, but

related, arguments why summary judgment should be denied.  The City asserts that it can

prove at trial that WTPA interfered with its attempt to garnish the debtor's accounts by

not closing Mylotte's bank accounts once it knew or should have known that Mylotte was

---

[10]The City's contention is that allowing Mylotte access to the $50,000, even for a
few days, reduced the City's leverage with its judgment debtor.  Such an argument is too
speculative to quantify any injury.

24

using a Delaware bank account for its operations.  The City opines that use of a Delaware

account violated Mylotte's business loan agreement with WTPA.  The City also contends

that it can prove at trial that its attempt to execute upon its judgment was thwarted by

WTPA's actions, such as its loan of $75,000 to the debtor, which funds were deposited

into the debtor's Delaware account.  The City contends that this loan advance should have

been deposited into Mylotte's WTPA accounts, which would have subjected those funds

to the City's execution levy.

These arguments are unpersuasive both for factual and legal reasons.

My review of the WTPA bank records attached by the City in its response

to summary judgment, Response ex. T, reveal that there was no activity—beyond the

accrual of interest—in either of Mylotte's two general bank accounts, its money market

and checking accounts, after July 31, 2006.  That these accounts were not closed until

later dates caused no injury to the City, especially given WTPA's right of setoff.

Moreover, the execution levy does not, by itself, require the garnishee bank

to close the attached account.  The effect of the execution levy under Rule 3111 imposes

a duty upon the garnishee bank to freeze the account so that its funds cannot be used.  See

Fidelity Bank v. Commonwealth Marine and General Assur. Co., Ltd., 581 F. Supp. 999,

1017 (E.D. Pa. 1984) ("Service of the writ freezes the assets of the defendant in the hands

of the garnishee.  Pa. R. Civ. P. 3111(b), (c) (Purdon 1975).  However, the creditor has no

right to the property until he obtains a judgment against the garnishee."); see also Garden

City Shopping Center, Inc. v. Super General Stores, 29 Pa. D. & C.3d 319, 336 (C.P.

Allegh. Co. 1982).  Indeed, if the judgment defendant deposits funds into a frozen,

garnished account, the execution levy would attach to those new funds.  See Pa. R. Civ. P.

25

3111(b).  The City implicitly recognizes that the Pennsylvania garnishment rules allow

the account to remain open by arguing that Mylotte's post-garnishment WTC deposits

should have been made with WTPA.

       The ultimate closure of these two accounts is likely attributable to WTPA's

exercise of its setoff rights and not to any duties as garnishee.

       The documents offered by the City in opposition to summary judgment

reveal that the City might well prove at trial that WTPA knew or should have known of

Mylotte's use of the WTC bank account in Delaware after garnishment.  I also agree that,

at trial, the City could prove (indeed WTPA acknowledges) that WTPA continued its

lending relationship with Mylotte after the WTPA bank accounts were garnished and

without requiring Mylotte to deposit these additional loan proceeds into WTPA accounts.

The City contends that WTPA's actions in allowing Mylotte to use a Delaware bank

account and to continue to lend it funds were intended to aid Mylotte in thwarting the

City's execution efforts.  The City maintains that WTPA had a "duty of care" to protect

the City's rights as an execution creditor.  Response, at 16; see also Surreply, at 5 (WTPA

as garnishee owed a duty to the City).  In support of its position regarding WTPA's duty

towards it, and that this duty was breached thus warranting civil contempt, the City relies

heavily upon Witco Corporation v. Herzog Brothers Trucking, Inc., 580 Pa. 628 (2004).

Response, at 6, 15-17.

       In Witco Corporation v. Herzog Brothers Trucking, Inc., the Pennsylvania

Supreme Court accepted a Petition for Certification from the Third Circuit Court of

Appeals and answered three questions in the affirmative:

> (1) whether a drawee bank obtains "possession" of any
> property, as defined by Pa.R.C.P. 3101, of a customer who

26

physically provides the drawee bank's teller with cash and
checks, in exchange for the issuance of a bank cashier's
check, when those funds are never deposited into the
customer's account at the drawee bank; (2) whether a
garnishee bank, which receives "possession" of the property
of a judgment debtor after being served with a writ of
execution, has a duty under Pa.R.C.P. 3111(c) "restraining [it]
from paying any debt" to that judgment debtor in exchange
for that property, even if that "debt" arises during a
transaction with a brief duration akin to that of a sales
transaction; and (3) whether the public policy underlying
Pennsylvania garnishment law requires a garnishee bank, on
notice of a judgment order against a depositor by Writ of
Execution and whose accounts are thereby held, to refrain
from engaging in transactions with that judgment debtor
which permit the judgment debtor to avoid the garnishment of
its assets, and thereby the debtor's obligation to pay its
judgment creditor, to the financial benefit of the garnishee
bank.

Id., at 629.

The Witco decision did not involve any setoff rights of a garnishee bank.

That is, there was no judgment defendant/borrower–garnishee/lender relationship in the

Witco decision, as exists in the instant adversary proceeding.  Indeed, the undisputed facts

in this dispute render inapplicable the Supreme Court's answers to questions 1 and 2.  The

City, though, believes that the resolution of Witco's question 3 is highly germane.  It

argues that WTPA improperly aided Mylotte in avoiding execution upon its assets and

therefore summary judgment in favor of the garnishee is unjustified.

The salient facts of Witco were summarized by the Pennsylvania Supreme

Court as follows:

[S]ubsequent to the service of the writ of execution upon the
Bank but before entry of judgment against the [garnishee]
Bank, a period spanning from July 5, 1996 to August 11,
1997, Herzog Brothers [the judgment defendant] purchased at
least 131 cashiers' checks from the Bank, using personal
checks and cash.  As to each purchase of a cashier's check,

27

Herzog presented his personal checks or cash to the Bank at the teller windows whereupon the Bank would issue "official checks" drawn on the Bank and payable to various designees specified by Herzog.  The aggregate value of these checks exceeds $6,000,000.  During the same time period, the Bank made fourteen payments to itself totaling $22,718.86 from funds presented to the Bank's tellers by Herzog in the form of personal checks or cash.  The Bank's own internal policy required that all funds used for the issuance of "official checks" in an amount in excess of $3,000 first be deposited into an account at the Bank. The Bank also customarily placed a hold on funds from foreign bank checks in order to verify that the accounts on which the checks were drawn contained sufficient funds to cover the checks.  Both of these policies were waived in the Bank's dealings with Gary Herzog and Herzog Brothers.

Id., at 630-31 (footnote omitted).

From these facts the Witco court determined that the garnishee bank "acquiesc[ed] in a course of conduct that treated Herzog Brothers differently than other customers, and essentially allowed Herzog Brothers to exchange its assets without exposing them to garnishment. The Bank thus permitted Herzog Brothers to continue a banking relationship without requiring them to actually deposit money into any of Herzog Brothers' garnished accounts. This arrangement benefited the Bank as well as Herzog Brothers, to the tune of over $22,000 in little more than a year." Id., at 640.  In so doing, the Pennsylvania Supreme Court determined that the garnishee bank acted improperly. Id.

The City contends that WTPA, like the garnishee bank in Witco, improperly aided Mylotte in thwarting the City's attempts to execute upon Mylotte's assets by continuing its lending relationship without insisting that Mylotte use any WTPA bank accounts.  The City does not suggest that it will prove at trial that Mylotte continued to have a banking relationship with WTPA similar to the one described in Witco.  Nor does

28

the City point to any internal bank regulations ignored by WTPA in its post-garnishment

dealings with Mylotte.  Thus, to support its parallel to <u>Witco</u>, the City focuses upon the

2000 business loan agreement (as if it were a bank regulation) and argues that WTPA

violated its terms in order to interfere with the City's garnishment efforts.

      The provisions of the 2000 business loan agreement alleged violated by

WTPA were quoted earlier.  One is a definition of collateral which included a "Primary

Bank Account."  The other is the "effect of an event of default" clause that "terminate[d]"

any obligation of WTPA to make future loan advances to Mylotte.

      Since the entry of the judgment against Mylotte, unsatisfied for 30 days,

plus the garnishment action constituted borrower defaults under the business loan

agreement, the City argues that the business loan agreement obligated WTPA to terminate

its lending relationship with Mylotte.  The City further asserts that WTPA ignored this

obligation when it advanced Mylotte additional funds after the borrower defaulted on its

loan obligation and the execution process commenced.  And, in the City's opinion,

WTPA compounded its violation of the business loan agreement by not requiring Mylotte

to use its WTPA accounts as primary bank accounts.[11]

      The City does not suggest that Pennsylvania's execution rules require a

garnishee bank to insist that its judgment/defendant customer continue to use the attached

bank account.  Nor does the City argue that a garnishee bank is forbidden by state law

from lending funds to a judgment/defendant.  Indeed, it cites no decisions so holding.

Thus, the City looks to find these restrictions in the 2000 business loan agreement.  And

---

[11]Of course, if Mylotte had deposited the February 2007 loan proceeds into its
account with WTPA, those funds would not have been paid to the City.  Instead, WTPA's setoff
rights would have prevailed.

29

to the extent such restrictions exist, the City views them as analogous to internal bank regulations referred to in Witco.

If I assume arguendo that the provisions of the 2000 agreement are material in this proceeding, upon review of its terms, I find that the agreement does not contain the restrictions now asserted by the City.  The City's construction of the contract as creating an obligation upon WTPA to cease all lending activity with Mylotte—a cessation that the City argues would have been harmful to Mylotte and so helpful to the City's collection activities—is unfounded.  Moreover, the identification of a primary account as among WTPA's collateral does not impose any contractual requirement upon WTPA.

Implicit in the City's complaint about a post-garnishment loan to Mylotte is its argument that the word "terminated" found in the "event of default clause" should be interpreted to mean "prohibited."  These words are not, however, synonymous.  According to Black's Law Dictionary, "prohibit" means to forbid by law or to prevent or hinder.  Black's Law Dictionary 1248 (8th ed. 2004).  The word "terminate" means "to put an end to; to bring to an end . . . to end; to conclude."  Black's Law Dictionary 1510 (8th ed. 2004).

Thus, upon Mylotte's default of its borrowing agreement with WTPA, the agreement neither prevented or forbade WTPA from continuing its lending relationship with Mylotte.  The loan agreement simply prevented Mylotte from compelling WTPA to make future loan advances to a borrower in default.  WTPA, however, had the contractual right to exercise all, some or none of its rights upon Mylotte's default.  See ex. S at WT0086.  In such exercise, WTPA was free to act in its perceived self-interest without regard to the City's interests.  Thus, WTPA had the right to ignore Mylotte's default and

30

continue to advance funds.  See id.  Similarly, to the extent the loan agreement obligated

Mylotte to deposit all of its funds with WTPA, the lender had the right to ignore

Mylotte's failure to do so.  Both of these provisions were intended to protect WTPA's

interests as lender and were waivable.  See generally Citizens Trust Co. of Clarion, Pa. v.

Trunk, 30 D. & C. 511, 515 (C.P. Clar. Co. 1937).

　　　　　Unlike the facts developed in Witco, which demonstrated that the garnishee

bank essentially allowed a judgment defendant to make bank deposits and withdrawals

despite the garnishment and in circumvention of the garnishee's own internal policies, the

undisputed facts in this proceeding show that the garnishee bank, WTPA, elected to

exercise its right to continue a lending relationship with its borrower, despite the

borrower's default in its loan obligations.  The borrower, Mylotte, used a different bank

account, opened prior to any garnishment and located in a different state—a state which

prohibits execution on bank accounts—and did not use any general accounts with WTPA.

In so acting, WTPA did not violate the terms of the loan agreement or eschew its own

internal policies.[12]

　　　　　Summary judgment may be granted on an issue of contract interpretation as

long as the language of the contract is unambiguous and capable of only one reasonable

interpretation.  See Ford v. Panasonic Corp. of North America, 2008 WL 2605591, at *2

(3d Cir. 2008); Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521-

22 (3d Cir. 1999).  The City's equation of the undisputed facts of this adversary

proceeding to those of Witco is unpersuasive.

---

　　　　　[12]As WTPA's claim increased significantly because of its decision to continue the
lending relationship, its decision to do so may have been unwise.

V.


            In sum, the only claim by the City against WTPA before me in this

adversary proceeding is whether WTPA can be held in contempt, under Pa. R. Civ. P.

3111(d), for actions taken as garnishee.  And as garnishee, the duty that WTPA owed to

the City is found in Rule 3111(c): to freeze all assets of Mylotte that came into its

possession after service of the writ of execution.  See, e.g., Mutual Fire Marine and

Inland Ins. Co. v. First Nat. Bank of Harrison, Ark., 1987 WL 15228, at *5

(E.D. Pa. 1987).  The state court previously held that WTPA held no assets of Mylotte's

that were subject to attachment under state law and were not subject to a prior right of

setoff.  Thereafter, WTPA did not come into possession of attachable assets of Mylotte.

Thus, it did not violate its duty to freeze.

            The City's additional argument—that WTPA, as garnishee, had a duty to

enforce its loan agreements with Mylotte in a manner that would assist the City in the

recovery of its debt—is not supported by Pennsylvania law.  The City argues:

> If the Debtor had not been able to borrow money from WTPA
> and operate with these borrowed funds through the Delaware
> affiliate of WTPA, the Debtor would have had to have settled
> with the City, [sic] in order to operate.

Surreply, at 5.  This argument misconstrues the obligations of a garnishee.

            WTPA had no duty to exercise all of its contractual rights upon Mylotte's

loan default simply because such exercise might increase the City's pressure on its

judgment defendant.  WTPA had the right to act in its own interests to maximize its

recovery as a creditor of Mylotte, so long as it enforced the state law freeze created by

32

service of the execution writ.  If WTPA's legitimate actions as a creditor of Mylotte

weakened the garnishor's leverage with Mylotte, they would not be contemptuous.

   Accordingly, the City has not met its burden to demonstrate that a trial in

this adversary proceeding involving WTPA as garnishee is warranted.  Thus, an order

granting summary judgment in favor of WTPA will be entered.


                _____
                BRUCE FOX
             United States Bankruptcy Judge


Dated: August 22, 2008.


                         33